**Opinion filed March 8, 2012**



In The

# Eleventh Court of Appeals

_____

## No. 11-10-00303-CR
_____

## GUILLERMO CINTRON ORTIZ, Appellant

### V.

## STATE OF TEXAS, Appellee

**On Appeal from the 54th District Court**
**McLennan County, Texas**
**Trial Court Cause No. 2009-1455-C2**

### M E M O R A N D U M   O P I N I O N

The jury convicted Guillermo Cintron Ortiz of five counts of indecency with a child by contact. TEX. PENAL CODE ANN. § 21.11 (West 2011). The jury assessed punishment for each count at confinement in the Institutional Division of the Texas Department of Criminal Justice for a term of twenty years and a fine of $2,000. The trial court ordered the sentences to run consecutively and entered a judgment of conviction on each count. We affirm the trial court's judgments on all counts.

Ortiz presents two points of error for review. In his first point, he contends that the trial court egregiously and erroneously commented on the weight of the evidence in violation of Article 36.14 of the Texas Code of Criminal Procedure. In his second point, he asserts that the

evidence at trial was insufficient to sustain his conviction for five counts of indecency with a child by contact.

Article 36.14 of the Texas Code of Criminal Procedure provides that the judge shall deliver to the jury "a written charge distinctly setting forth the law applicable to the case; not expressing any opinion as to the weight of the evidence, not summing up the testimony, discussing the facts or using any argument in his charge calculated to arouse the sympathy or excite the passions of the jury." TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007). Ortiz asserts in his first point of error that the trial court egregiously and erroneously commented in the jury charge on the weight of the evidence by adopting the State's version of the events. Specifically, Ortiz argues that the trial court endorsed the State's version of the events when it wrongfully inserted nonexistent and contested facts into the jury charge that substantiated the State's case. We note that Ortiz did not object to the trial court's charge. The portion of the charge that he challenges on appeal is as follows:

> The Defendant is on trial solely on the charges contained in the indictment in Count 1, Count 2, Count 3, Count 4, and Count 5.
>
> To prove the offense alleged in the indictment in Count 1, the State has elected to proceed on the alleged event that occurred at 2117 Gurley, McLennan County, Texas, in [B.A.]'s bedroom when [E.N.] was not at home, in which the Defendant, Guillermo Cintron Ortiz, allegedly committed the offense, if any.
>
> To prove the offense alleged in the indictment in Count 2, the State has elected to proceed on the alleged event that occurred at 2117 Gurley, McLennan County, Texas, in [B.A.]'s bedroom when [E.N.] was not at home, in which the Defendant, Guillermo Cintron Ortiz, allegedly committed the offense, if any.
>
> To prove the offense alleged in the indictment in Count 3, the State has elected to proceed on the alleged event that occurred at 2117 Gurley, McLennan County, Texas, in [B.A.]'s bedroom when [E.N.] was at home, in which the Defendant, Guillermo Cintron Ortiz, allegedly committed the offense, if any.
>
> To prove the offense alleged in the indictment in Count 4, the State has elected to proceed on the alleged event that occurred at 2117 Gurley, McLennan County, Texas, in [B.A.]'s bedroom when [E.N.] was at home, in which the Defendant, Guillermo Cintron Ortiz, allegedly committed the offense if any.
>
> To prove the offense alleged in the indictment in Count 5, the State has elected to proceed on the alleged event that occurred at 2400 Kendall, McLennan County, Texas, in the master bedroom, in which the Defendant, Guillermo Cintron Ortiz, allegedly committed the offense, if any.

2

Counts One and Four of the indictment alleged that Ortiz engaged in sexual contact with B.A. by touching the breast of B.A. on or about June 1, 2002, and February 3, 2003, respectively. Count Two alleged that Ortiz engaged in sexual contact with B.A. by touching the genitals of B.A. on or about June 1, 2002. Counts Three and Five alleged that Ortiz caused B.A. to engage in sexual contact by causing B.A. to touch the genitals of Ortiz on or about June 1, 2002, and February 3, 2004, respectively. The counts as alleged in the indictment were included in the trial court's charge.

Ortiz argues that the elections made by the State do not match B.A.'s testimony because B.A. only testified that sexual contact between her and Ortiz occurred, at most, four times and that only two of those events occurred at 2117 Gurley. Thus, Ortiz contends that the jury charge assumes the truth of controverted issues because the charge endorses the State's version of the events. We do not agree.

"A charge that assumes the truth of a controverted issue is a comment on the weight of the evidence and is erroneous." *Whaley v. State*, 717 S.W.2d 26, 32 (Tex. Crim. App. 1986). The portion of the jury charge at issue here does not assume the truth of controverted issues. The election language used in the jury charge is neutral. As to the State's election for Count 1, the jury charge provides, "To prove the offense *alleged* in the indictment in Count 1, the State has elected to proceed on the *alleged* event that occurred at 2117 Gurley, McLennan County, Texas, in [B.A.]'s bedroom when [E.N.] was not at home, in which the Defendant . . . *allegedly* committed the offense, *if any*" (emphasis added). This same language is used in each of the State's elections on the other four counts. Nothing in this language suggests that the State's version of the events must be true. Instead, this language sets out the specific place and circumstance that the State alleged Count 1 occurred. Thus, for the jury to convict Ortiz on Count 1, the jury was required to find that he engaged in sexual contact with B.A. by touching the breast of B.A. on or about June 1, 2002, at 2117 Gurley, McLennan County, Texas, in B.A.'s bedroom when E.N. was not at home.

In addition, Ortiz's argument that the State's elections do not match B.A.'s testimony and, thus, the charge endorses the State's version of events is misguided. Even if the State's elections do not match B.A.'s testimony, the jury charge does not endorse the State's version of the events or comment on the weight of the evidence. "[T]he election requirement protects fundamental rights such as notice and unanimity, insuring both that the defendant is aware of

precisely which act he must defend himself against, and that the jurors know precisely which act they must *all* agree he is guilty of in order to convict him." *Phillips v. State*, 193 S.W.3d 904, 910 (Tex. Crim. App. 2006). Here, the State's election required the jury to unanimously agree that Ortiz committed a specific act at a specific place with certain surrounding circumstances. Had the trial court not included the State's election language in the jury charge, the jury could have possibly convicted Ortiz of indecency with a child by contact without unanimously agreeing on which act of indecency he committed for each count. If indeed the State's elections do not match B.A.'s testimony, the evidence may be insufficient to uphold Ortiz's convictions. But, the trial court did not comment on the weight of the evidence when it included the State's elections in the jury charge. We overrule Ortiz's first point of error.

In his second point of error, Ortiz argues that the evidence was insufficient to sustain his conviction for five counts of indecency with a child by contact. We review a sufficiency of the evidence issue, regardless of whether it is denominated as a legal or as a factual sufficiency claim, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we examine all of the evidence in the light most favorable to the verdict and determine whether, based on that evidence and any reasonable inferences from it, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

Counts One, Two, Three, and Four of the indictment, when read with the State's elections, alleged that Ortiz engaged in sexual contact with B.A. or caused B.A. to engage in sexual contact at 2117 Gurley. Ortiz argues that these four alleged events were not supported by B.A.'s testimony because B.A. only testified to two events that occurred at 2117 Gurley. While Ortiz is correct in stating that B.A. only testified to two "events," he fails to recognize that, within each "event," B.A. testified to multiple criminal acts of indecency. Although the criminal acts may have taken place in the same encounter (on the same day at roughly the same time and in the same house), each act is separate and may be prosecuted as a different offense. *See Pizzo v. State*, 235 S.W.3d 711, 717 (Tex. Crim. App. 2007) ("A person can engage in sexual contact by touching the anus, by touching the breast, or by touching the genitals with the requisite intent. Each one of these acts represents a different offense.").

4

B.A. was seventeen years old at the time of trial. She testified that, from kindergarten until fifth grade, she lived at 2117 Gurley. For a period of time when she was nine and in the third grade, she and her family moved in with her grandmother and her step-grandfather, Ortiz, at 2400 Kendall. Her uncle J.Q., who was one and one-half years older than B.A., also lived at the Kendall address. Ortiz would take care of B.A. and the other kids while they were living there. Her grandmother worked at Clayton Homes and would not get home until four o'clock. Ortiz took B.A.'s grandmother to and from work each day even though she had a car she could have driven. B.A.'s mother worked at Time Warner Cable and would usually get home late. B.A.'s two younger brothers were in daycare, and Ortiz would pick them up after he picked up her grandmother from work if B.A.'s mother was working late. Ortiz remodeled homes for a living, including the house on Gurley, and thus did not have to be at work at certain hours.

B.A.'s first memory of something happening with Ortiz was at the house on Kendall. She testified that he came and got in the guest bed with her while she was sleeping one night. Her grandmother came in the room and asked what he was doing in there. Ortiz fell on the floor and then got up and walked out. He did not touch B.A. during this first incident.

B.A.'s next memory was during the summer while she lived at 2400 Kendall. She went inside to get a Band-Aid out of her grandmother's restroom because J.Q. had hurt himself outside. Ortiz followed her into the master bedroom and locked the door. He told her to take off her clothes, and he took off his clothes. They both removed only their pants and shirts. B.A. could not remember whether Ortiz touched her breasts during this incident, but did remember that he kissed her mouth and that, as he was lying on top of her on the bed, she could feel his penis moving back and forth on her thigh. Afterward, he told her to put her clothes on because he had to pick up her grandmother. He gave her twenty dollars and told her not to tell anyone because they would hate her and would not believe her because she was a bad kid. He also told her that he loved her. B.A. said that she did not tell anyone about this incident after it happened because she was scared. J.Q. and B.A.'s brother, E.N., were outside during this incident.

The third incident that B.A. testified about occurred in her bedroom at her home on Gurley. Ortiz came in her room and told her to take her clothes off, and he took his clothes off. She kept her panties on but was not wearing a bra, and Ortiz did not have on any clothing. Ortiz lay on top of her and kissed her on her mouth, neck, breasts, and stomach. B.A. described that, when Ortiz was kissing her breasts, it felt "[l]ike he was sucking on them or biting them." She

5

could feel his teeth biting, and it hurt.  She could also feel his penis on her vagina; he moved it back and forth.  B.A. testified that it "felt nasty."  When he got up, sperm came out of his penis, and he wiped it on his shirt.  Her brother, E.N., was not at home when this incident occurred because he had tutoring.

B.A.'s testimony regarding this incident supports Counts One and Two.  Count One of the indictment, when read with the State's election, alleged that Ortiz engaged in sexual contact with B.A. by touching the breast of B.A. in B.A.'s bedroom at 2117 Gurley when E.N. was not at home.  Count Two of the indictment, when read with the State's election, alleged that Ortiz engaged in sexual contact with B.A. by touching the genitals of B.A. in B.A.'s bedroom at 2117 Gurley when E.N. was not at home.  Ortiz points out this testimony by B.A. in his brief, but argues it is inconsistent with the allegations because it did not happen on separate occasions.  As we discussed above, this argument is without merit.  Thus, B.A.'s testimony is consistent with the allegations.

The next specific incident that B.A. could remember occurred at 2400 Kendall.  B.A., E.N., and J.Q. were all sitting in the living room watching television when Ortiz told B.A. to come into the master bedroom.  Ortiz told her to sit on the bed, and he put a videotape in the VCR.  E.N. and J.Q. remained in the living room.  Ortiz closed the bedroom door.  The video showed a young white girl giving a young white boy oral sex.  While Ortiz showed her the video, he told her that one day she would be able to do that.  This made her want to die.  Ortiz kept her in the room for about twenty minutes and then told her she could go.  He also gave her twenty dollars.

B.A. testified that, at another time on Kendall, Ortiz made her touch his penis.  Ortiz told her to come into the master bedroom and pulled down his pants and underwear.  She remembered that he was wearing white underwear.  He made her take her clothes off and told her to touch his penis.  She was standing beside the bed, and he was standing beside her.  His penis "was sticking out . . . straight" and pointing toward her.  She did not want to touch it, but he told her it was okay and grabbed her hand.  She put her whole hand around his penis for a second.  He told her she could go and gave her money.

B.A.'s testimony regarding this incident supports Count Five of the indictment.  Count Five of the indictment, when read with the State's election, alleged that Ortiz caused B.A. to engage in sexual contact by causing B.A. to touch the genitals of Ortiz in the master bedroom at

2400 Kendall. Ortiz states in his brief that "[i]t is conceivable that this Count may be supported by B.A.'s testimony." He also cites to the portion of B.A.'s testimony that supports this allegation. The State argues that Ortiz has waived his sufficiency argument as to Count Five. We agree. However, even if Ortiz did not waive this argument, B.A.'s testimony supports Ortiz's conviction on this count.

The next specific incident that B.A. recalled occurred at the house on Gurley. B.A. and E.N. had just come home from school and were in their separate bedrooms. Ortiz was there working on the house. B.A.'s two younger brothers were in daycare, and her mother was at work. Ortiz told E.N. goodbye and then went into B.A.'s room and told her he was about to leave. He locked the door, took his clothes off, and told B.A. to take her clothes off. B.A. removed all of her clothing, and Ortiz lay on top of her. She felt his penis between her legs and could feel it on her skin. He was moving it back and forth, rubbing it on her crease between her legs. Ortiz kissed her on her neck, breasts, and mouth. When he kissed her breasts it hurt. Her eyes watered, and she got a bruise on her breast. B.A. did not know what made him stop, but he just stopped. Sperm came out of his penis and went on her left thigh. Ortiz wiped it off with his shirt and then left to go pick up B.A.'s grandmother.

B.A.'s testimony regarding this incident supports Counts Three and Four. Count Three of the indictment, when read with the State's election, alleged that Ortiz caused B.A. to engage in sexual contact by causing B.A. to touch the genitals of Ortiz in B.A.'s bedroom at 2117 Gurley when E.N. was home. Count Four of the indictment, when read with the State's election, alleged that Ortiz engaged in sexual contact with B.A. by touching the breast of B.A. in B.A.'s bedroom at 2117 Gurley when E.N. was home. Ortiz points out this testimony by B.A. in his brief, but again argues that it is inconsistent with the allegations because the individual acts of indecency did not happen on separate occasions. As we have discussed, this argument is without merit. Although B.A. did not testify that Ortiz caused her to touch his genitals with her hand during this incident, she did testify that he caused her body to touch his genitals when he rubbed his penis back and forth between her legs. The definition of sexual contact includes "*any touching of any part of the body of a child*, including touching through clothing *with* the anus, breast, or *any part of the genitals of a person*." Section 21.11(c)(2) (emphasis added). B.A. also testified that Ortiz kissed her breasts. Therefore, B.A.'s testimony is consistent with the allegations in Counts Three and Four.

B.A. also remembered a time on Gurley where she was playing on her mother's piano and Ortiz came in the room and kissed her on her mouth with his tongue. She said it made her feel nasty. B.A. could not remember any other specific incidents of a sexual nature that occurred with Ortiz. She testified that he touched her or made her take her clothes off almost every other day. It happened more than thirty times and stopped when she was about eleven years old. B.A. believed it stopped because she got her period.

B.A. testified that Ortiz called her his baby and gave her more money than any of the other kids. She did not tell anyone what was going on because she did not want to get in trouble and did not want to hurt her grandmother. The first person she told was her first boyfriend. She told him during the fall of her freshman year in high school because they were talking about secrets and because she trusted him. In May of her sophomore year, she told her mom, her principal, her vice principal, and the security guard at her school what happened. These were the first adults that she ever told.

E.N. testified that he saw B.A. and Ortiz go into rooms and close the door. He said that they would lock the door and would not come out for a while. When B.A. would finally come out, she always looked depressed and stressed out and would be carrying money in her hand. Ortiz gave B.A. more money than he gave E.N. or J.Q. E.N. remembered a specific time that he and J.Q. were on the couch in the living room at the house on Kendall when B.A. and Ortiz went into the bedroom together and would not come out.

B.A.'s boyfriend from high school testified that, while they were dating during B.A.'s ninth grade year, B.A. told him on the phone one night that her grandfather touched her inappropriately when she was younger. It was very clear to him that B.A. meant sexual touching. He was the first person that she ever told, and he encouraged her to tell the authorities.

B.A.'s mother testified that she saw Ortiz give her daughter money. She also saw B.A. jerk away and ignore Ortiz when he showed her affection. At the time, she thought B.A. was being disrespectful to Ortiz and scolded her for her behavior. She testified that she should have noticed the amount of money Ortiz was giving B.A. and that she should have asked B.A. why she tried to avoid being around Ortiz instead of scolding her.

B.A.'s grandmother testified that Ortiz kept pornography in their bedroom that depicted young-aged women having oral intercourse with young-aged men. She did not approve of the pornography and threw it away sometime in 2004. Ortiz told her that he gave more money to

B.A. than to the other kids because little girls need to buy more things. She did not believe that Ortiz was guilty and said that he was not that kind of person.

Ortiz testified that he did not molest B.A. and gave three reasons for why B.A. would make up the allegations against him: (1) because he teased her about having a boyfriend; (2) because he told her mother not to put her on birth control; and (3) because he and his wife (B.A.'s grandmother) scolded B.A. for not being ready to leave the movie theater when his wife arrived. He also testified that he calls all his female relatives "[b]aby."

Although Ortiz denied ever touching B.A. and several witnesses testified on behalf of Ortiz, the jury, as the trier of fact, was the sole judge of the credibility of the witnesses and of the weight to be given their testimony. TEX. CODE CRIM. PROC. ANN. art. 36.13 (West 2007), art. 38.04 (West 1979). As such, the jury was entitled to accept or reject any or all of the testimony of any witness. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992). As discussed above, B.A.'s testimony was not inconsistent with the allegations in the indictment or with the State's elections. The complainant's testimony alone is sufficient to support a conviction for indecency with a child. TEX. CODE CRIM. PROC. ANN. art. 38.07 (West Supp. 2011); *Chapman v. State*, 349 S.W.3d 241, 245 (Tex. App.—Eastland 2011, pet. ref'd). In addition, E.N., B.A.'s mother, and B.A.'s grandmother corroborated parts of B.A.'s testimony. We have reviewed the evidence in the light most favorable to the verdict, and we hold that a rational trier of fact could have found the elements of indecency with a child by contact for all five counts beyond a reasonable doubt. We overrule Ortiz's second point of error.

The judgments of the trial court on each of the five counts of indecency with a child by contact are affirmed.


JIM R. WRIGHT
CHIEF JUSTICE

March 8, 2012

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
McCall, J., and Kalenak, J.

9